UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 13-257 (SRN/FLN)

Dale F. Meyer,

        Plaintiff,

    v.                       **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,[1]
Acting Commissioner of Social Security,

        Defendant

_____

Neut L. Strandemo, Esq., for Plaintiff

Ana H. Voss, Assistant United States Attorney, for Defendant

_____

       Plaintiff Dale F. Meyer seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who found Plaintiff was not disabled for the period between

August 2007 and January 7, 2009.  This Court has jurisdiction over the claims pursuant to 42

U.S.C. § 405(g).  The parties submitted cross-motions for summary judgment.  [Doc. Nos. 12,

19.]  The matter was referred to the undersigned United States Magistrate Judge for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons which

follow, this Court recommends that Plaintiff's motion for summary judgment be denied, and

Defendant's motion for summary judgment be granted.

_____

[1] Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant
pursuant to Fed. R. Civ. P. 25(d).

1

## I. INTRODUCTION

Plaintiff filed applications for supplemental security income and disability insurance benefits on September 7, 2007, alleging a disability onset date of August 27, 2007. (Tr. 110-18.) His applications were denied initially and upon reconsideration. (Tr. 51-55, 66-71.) He requested a hearing before an ALJ, and the hearing was held on December 12, 2008. (Tr. 72-73, 19-45.) The ALJ denied Plaintiff's claim on January 6, 2009. (Tr. 8-18.) The Appeals Council then denied Plaintiff's request for review. (Tr. 1-3.) Plaintiff sought judicial review of the Commissioner's decision and also filed a new application for benefits. (Tr. 432.) Based on Plaintiff's subsequent application, the Commissioner found Plaintiff was disabled as of January 7, 2009. (*Id.*) The Court remanded the initial decision to the Commissioner for further proceedings on February 3, 2011. (Tr. 515-43); *Meyer v. Astrue*, No. 09-cv-03205 (MJD/LIB), 2011 WL 495637 (D. Minn. Jan. 18, 2011) adopted by *Meyer v. Astrue*, No. 09-cv-03205 (MJD/LIB), 2011 WL 486261 (D. Minn. Feb. 3, 2011). On remand, the ALJ was required to address deficiencies in the RFC assessment, particularly addressing the credibility factors and the claimant's ability to maintain persistence or pace in full-time competitive employment. (*Id.*)

Upon remand, on August 24, 2011, the ALJ conducted another hearing on Plaintiff's initial applications for benefits. (Tr. 454-70.) Then, the ALJ denied Plaintiff's claim for disability for the period of August 27, 2007 through January 6, 2009. (Tr. 429-50.) Plaintiff filed exceptions to the Appeals Council on November 28, 2011. (Tr. 425-28). The Appeals Council denied review based on the tardiness of appeal. (Exhibit to Answer, Doc. No. 7.) The ALJ's September 27, 2011 decision therefore became the final decision of the Commissioner. Plaintiff

filed a complaint for judicial review on January 31, 2013.  The matter is now before this Court on cross-motions for summary judgment.

## II.    STATEMENT OF FACTS

### A.    Employment History

Plaintiff worked as a bellman for eight years, from August 1994 through August 30, 2002. (Tr. 171.)  For the next five years, Plaintiff worked as a bus driver.  (*Id.*)  He was in a car accident and injured his back on August 27, 2007, and never returned to work.  (Tr. 164, 196.)

### B.    Medical Records

Plaintiff was brought to the emergency room at Fairview Red Wing Hospital on August 27, 2007, after being involved in a car accident.  (Tr. 233-37.)  On examination, Plaintiff exhibited some vertebral point tenderness.  (Tr. 236.)  His neurological tests were normal.  (Tr. 235.)  X-rays and CT scans of Plaintiff's chest, pelvis, cervical spine, brain, and lumbar spine were negative.  (Tr. 239-42.)  Plaintiff was treated with Toradol and discharged with prescriptions for Vicodin and ibuprofen.  (Tr. 243.)  The clinical impression of his injury was lumbar sprain.  (Tr. 236.)

Plaintiff saw his primary physician, Dr. Mark Bettich at Fairview Red Wing Medical Center ("Fairview Red Wing"), on August 28, 2007, the day after Plaintiff's van was hit from behind.  (Tr. 225.)  Plaintiff had taken Vicodin but it made him sick, and he continued to have pain across his low back.  (*Id.*)  On examination, Plaintiff was not tender along the spine and there was no bruising, but he was tender and tight in the lumbar musculature.  (Tr. 226.)  Dr. Bettich diagnosed lumbar

strain and prescribed Percocet,[2] Soma[3] and ibuprofen.  (*Id.*)  Dr. Bettich gave Plaintiff an "off

work" letter, excusing him for approximately three weeks.  (*Id.*)  Plaintiff returned to see Dr.

Bettich on September 4, 2007, and reported that his back pain was the same if not worse, but the

pain did not radiate into his legs.  (Tr. 225.)  On examination, Plaintiff's spine was straight and

without tenderness.  (*Id.*)  His lumbar musculature was tight, his flexion and extension were limited,

and he walked hunched over.  (*Id.*)  Dr. Bettich referred Plaintiff to physical therapy and

orthopedics.  (*Id.*)

Plaintiff underwent an initial physical therapy evaluation at Fairview Red Wing on

September 6, 2007.  (Tr. 306-09.)  He complained of low back pain with left leg numbness, and

pain ranging from 8.5 to 10 on a scale of one to ten.  (Tr. 306.)  Plaintiff was only sleeping 3-4

hours at a time, and he had difficulty walking, difficulty with transitional movements, and trouble

lifting his seven-month-old child.  (*Id.*)  He was taking his medications as prescribed, but they were

only effective for a limited time.  (*Id.*)

On examination, Plaintiff moved in a guarded manner.  (Tr. 307.)  His posture was forward

flexed, his gait was antalgic, his range of motion was painful, and his lumbar paraspinal muscles

were tight.  (*Id.*)  He exhibited pain behaviors and had difficulty getting out of a chair.  (*Id.*)

Plaintiff's rehabilitation potential was thought to be good.  (Tr. 308.)  At his first physical therapy

session on September 11, 2007, Plaintiff rated his low back pain as seven out of ten in severity, and

he was very tender.  (Tr. 305.)  He complained of difficulty getting out of bed and getting dressed.

(*Id.*)  He used a TENS unit, which helped for short periods of time.  (*Id.*)  His heated recliner also

---

[2] Percocet is a combination of oxycodone and acetaminophen.  *Physicians' Desk Reference*
("*PDR*")1222 (59th ed. 2005).

[3] Soma produces muscle relaxation by blocking interneuronal activity.  *PDR* at 1976.

helped his back pain.  (*Id.*)  Driving over the weekend had increased his symptoms.  (*Id.*)  He was advised to avoid mowing the lawn, avoid driving, and avoid lifting.  (*Id.*)  Plaintiff's symptoms decreased after physical therapy.  (*Id.*)  The next day, Plaintiff saw Dr. Bettich and said he was using the TENS unit and taking ibuprofen and Soma.   (Tr. 278.)

In physical therapy on September 13, 2007, Plaintiff reported no change in symptoms.  (Tr. 304.)  On examination, there was edema over Plaintiff's distal lumbar spine, and he was hypersensitive to touch of the lumbar paraspinals and surrounding tissue.  (*Id.*)  Plaintiff was overdoing physical activity when he had relief from pain medications, which was only masking his pain and preventing him from resting his back.  (*Id.*)  Plaintiff reported a slight decrease in symptoms on September 20, 2007, rating his pain five or six out of ten.  (Tr. 303.)  He had taken a car trip, and his pain was bad after one hour of driving.  (*Id.*)  Five days later, Plaintiff reported a slight decrease in symptoms, rating his pain four or five out of ten.  (Tr. 302.)  He still needed thirty minutes to dress himself.  (*Id.*)  His pain increased the next week because he had been more active after his wife was diagnosed with congestive heart failure.  (Tr. 301.)  Plaintiff was walking more, caring for his children, and he did two loads of laundry that morning.  (*Id.*)

Plaintiff's symptoms were unchanged on October 2, 2007.  (Tr. 300.)  He had applied for disability because his doctor limited him from working at least through mid-October, and he was unable to continue farming on the side.  (*Id.*)  On objective examination, Plaintiff was able to stand more upright with support.  (*Id.*)  Three days later, Plaintiff reported he had to help care for his eight-month old daughter, and his pain had not improved.  (Tr. 299.)  He rated his pain, even on pain medications, at a level of eight out of ten.  (*Id.*)  Plaintiff had a thoracic MRI on October 8,

2007, indicating benign hemangiomas and small disc protrusions at T4-5, T6-7, and T7-8. (Tr. 284-85.)

Plaintiff saw Dr. Matthew Eich for an orthopedic consultation on October 8, 2007. (Tr. 276-77.) Dr. Eich noted Plaintiff did not have a back condition or limitation before his car accident. (Tr. 276.) Taking ibuprofen and a muscle relaxer helped somewhat, but his pain increased with prolonged standing, sitting and rolling over in bed. (*Id.*) On clinical examination, Plaintiff moved very guardedly with a forward flexed posture and using a wheeled walker. (Tr. 277.) With difficulty, he could stand without the walker. (*Id.*) He could not heel and toe walk due to pain and difficulty with balance. (*Id.*) He complained of severe pain with range of motion exercises. (*Id.*) He did not exhibit neurological deficits. (*Id.*) He was tender in the paralumbar and thoracic areas, but there was no spasm. (*Id.*) His lumbar CT scan showed mild degenerative changes in the facet joints but maintained bone heights and disc spaces. (*Id.*) Dr. Eich recommended that Plaintiff continue his medications and use the wheeled walker. (*Id.*) Plaintiff followed up with Dr. Eich a week later, and he was still in pain. (Tr. 275.) Dr. Eich's impression was "incapacitating thoracic disc syndrome follow[ing] motor vehicle accident." (*Id.*) Dr. Eich recommended a thoracic injection and gave Plaintiff a work slip, indicating he could not return to work as a bus driver. (Tr. 275-76.)

On October 25, 2007, Plaintiff rated his pain four out of ten, with use of pain medications. (Tr. 297.) Plaintiff had ridden a tractor the previous day for 45 minutes, until his pain became intolerable. (*Id.*) A few days later, Plaintiff's mid-back pain was at a level of eight out of ten after taking pain medications. (Tr. 296.) He had helped his father with farming the previous day, driving a tractor hauling corn for eleven hours. (*Id.*) The next week, Plaintiff reported that he had

continued to help his father haul corn, but they had finished the job.  (Tr. 295.)  Plaintiff had fallen

off his father's grain truck after he felt a "catch" in his back.  (*Id.*)  He had some swelling over the

mid to lower thoracic and lower lumbar spine.  (*Id.*)  Plaintiff rested for two days before his next

physical therapy session.  (Tr. 294.)

Plaintiff was miserable when he saw Dr. Eich again on November 12, 2007.  (Tr. 275.)  The

thoracic injection had not helped.  (*Id.*)  Plaintiff did not have radicular symptoms, but he had

difficulty walking.  (*Id.*)  Dr. Eich referred Plaintiff to a spine surgeon for evaluation, and also

noted Plaintiff would be seeing an independent medical examiner for insurance purposes.  (*Id.*)  He

was discharged from physical therapy on November 15, 2007.  (Tr. 293.)  He had not met his goals

because he could not get his pain under control.  (*Id.*)

Plaintiff underwent an initial evaluation with Dr. Kevin Mullaney at Twin Cities Spine

Center on November 16, 2007.  (Tr. 342-44.)  On examination, Plaintiff used a walker and had

difficulty standing up straight.  (Tr. 342.)  He had significant paraspinal muscle spasm.  (*Id.*)  In a

seated position, he had full leg strength.  (*Id.*)  His reflexes were hyporeflexive.  (*Id.*)  Dr. Mullaney

reviewed Plaintiff's thoracic MRI, and x-rays of his lumbar spine.  (*Id.*)  He stated:

> My impression, this patient is extremely straightforward and has zero
> out of 5 signs of symptom amplification.  He appears to be a hard
> working individual and he is a farmer, and on his clinical exam, he is
> quite debilitated.  He was diaphoretic[4] throughout the exam, during
> ambulation secondary to the diffuse nature of his pain at the
> thoracolumbar and lumbar regions.

(Tr. 343.)

Plaintiff had a CT scan of his lumbar spine on November 21, 2007.  (Tr. 282-83.)  The

impression from the scan was a small disc protrusion at L5-S1, contacting the right S1 nerve root.

[4] Diaphoresis means perspiration.  *Stedman's Medical Dictionary* 493 (27th ed. 2000).

(Tr. 283.)  There was also multilevel foraminal stenosis on the right at L4-5, with associated spurring.  (*Id.*)  There were hypertrophic and cystic changes at L2-3 and to a lesser extent at L3-4, which might represent early Baastrup disease.[5]  (*Id.*)  Plaintiff had a lumbar MRI the same day, showing early disc dehydration and degeneration, greatest at L5-S1; small right disc protrusion contacting but not displacing the right S1 nerve root, and mild foraminal stenosis, greatest on the left at L4-5.  (Tr. 281.)

Plaintiff underwent an independent medical evaluation with Dr. Asa Kim on December 4, 2007, regarding Plaintiff's insurance claim for his car accident.  (Tr. 412-23.)  Plaintiff described his current symptoms:  mid to low back pain that came and went, worse at night when he tried to lie down.  (Tr. 413.)  Sitting was the best position for him but getting up from sitting was difficult. (*Id.*)  Plaintiff reported pain at a level of six to eight out of ten, which was more or less steady, without significant improvement since the accident.  (*Id.*)  Plaintiff did not know what medications he was taking, but he thought they were muscle relaxants.  (*Id.*)  Dr. Kim reviewed Plaintiff's medical records.  (Tr. 414-18.)  He also reviewed photos of damage to Plaintiff's vehicle from the accident.  (Tr. 414.)  The right side of the rear bumper had been pushed downward.  (*Id.*)  Dr. Kim also considered Plaintiff's social history.  (Tr. 418.)  Plaintiff was married and had three children. (*Id.*)  He had completed high school and one year of technical college.  (*Id.*)  Plaintiff smoked cigarettes but had not touched alcohol for thirteen years.  (*Id.*)  He last worked as a bus driver and farmer.  (*Id.*)

---

[5] "Baastrup disease is characterized by the development of abnormal contact between adjacent spinous processes," and the clinical significance is unresolved.  Kwong Y., Rao N., Latief K., *MDCT findings in Basstrup disease: disease or normal feature of the aging spine?*  Available at http://www.ncbi.nlm.nih.gov/pubmed/21512085

On examination, Plaintiff was moderately obese, and at times showed acute distress, especially when trying to get up from a seated position. (Tr. 419.) Plaintiff arrived using a walker. (*Id.*) He did not have significant postural difficulty while sitting, but he was hunched over when standing. (*Id.*) Plaintiff became short of breath getting up from sitting to standing. (*Id.*) He did not limp, but his gait was somewhat labored. (*Id.*) His cervical spine examination was normal. (*Id.*) There was no muscle spasm of the thoracic spine, and no focal tenderness, erythema or kyphotic curvature. (*Id.*) There was tenderness on examination from T12 to L1, with 30 degrees flexion at the waist and flexion to 50 degrees with grimacing. (*Id.*) He could not extend beyond 30 degrees while standing, although his back was straight while sitting. (Tr. 420.) There was no palpable or visible muscle spasm. (*Id.*) Slight rotation also resulted in pain. (*Id.*) His straight leg raise test from the sitting position was negative. (*Id.*) His upper and lower extremities were normal. (*Id.*) His neurological tests were negative. (*Id.*)

Dr. Kim diagnosed chronic thoracolumbar pain. (Tr. 421.) Based on the mechanism of the injury, Dr. Kim would have expected minimal to mild sprain/strain injuries to the thoracic and lumbar spine, which should resolve uneventfully. (*Id.*) The magnitude and duration of Plaintiff's pain exceeded the anticipated course of progress, in Dr. Kim's opinion. (Tr. 421-22.) Dr. Kim also felt Plaintiff's body movement, such as relying on a walker and having difficulty getting up from a seated position, was more consistent with weakness of the lower extremities than with thoracic pain. (Tr. 422.) Thoracolumbar pain would not be expected to cause pain when getting up from a seated position. (*Id.*) There was no noticeable muscle spasm to explain why Plaintiff stood hunched over. (*Id.*) Dr. Kim found it unusual that Plaintiff could sit up straight but had to maintain a flexed posture standing up. (*Id.*) After reviewing Plaintiff's subsequent CT scan and lumbar MRI

findings, Dr. Kim found no evidence of acute trauma caused by the car accident. (Tr. 411.) He opined Plaintiff could resume full activities without limitations. (*Id.*)

Plaintiff also underwent another physical therapy evaluation on December 4, 2007. (Tr. 381.) Plaintiff rated his back pain eight or nine out of ten. (*Id.*) On examination, Plaintiff had an antalgic gait, with forward flexion at the trunk, and he used a walker. (Tr. 382.) His active range of motion was restricted in all ranges due to pain, and his passive range of motion was not tested. (*Id.*) His core stability was limited due to pain and weakness. (*Id.*) He exhibited pain behaviors on examination. (*Id.*) His neurological tests were within normal limits. (Tr. 383.) Plaintiff's physical therapist discussed with Plaintiff the role of chronic pain and stress, as Plaintiff reported significant stress because his mother had cancer, his wife had a heart condition, and his baby was having seizure activity. (Tr. 383.) Plaintiff refused to return to therapy due to a prior bad experience but indicated that he had four sponsors. (*Id.*)

On December 11, 2007, Dr. Eich completed a Social Security Spinal Disorder RFC Questionnaire regarding Plaintiff. (Tr. 346-52.) Plaintiff's diagnosis was T7-8 disc herniation. (Tr. 346.) Dr. Eich opined that Plaintiff's pain would frequently interfere with his attention and concentration. (Tr. 347.) Plaintiff was incapable of even low stress jobs, and Plaintiff could not ambulate effectively without assistance to perform daily activities. (*Id.*) Plaintiff could, however, occasionally stand or walk without a cane or other assistive device. (Tr. 348.) Dr. Eich opined that Plaintiff's symptoms would cause him to be unable to maintain persistence or pace to engage in competitive employment, and he was not capable of functioning on a part-time basis in a competitive work setting. (*Id.*) Plaintiff's symptoms moderately affected his ability to perform activities of daily living. (*Id.*) Dr. Eich opined Plaintiff could walk less than a block, sit for sixty

minutes at a time, and stand for thirty minutes at a time. (Tr. 349.) Plaintiff would be required to change his position from sitting to standing or walking every 20-30 minutes. (Tr. 350.) Plaintiff could minimally bend, pull and walk up an incline. (*Id.*) He could never twist, climb or crawl. (*Id.*) He could occasionally stoop, kneel, crouch, reach, push, perform overhead work, maintain static neck flexion and rotation. (*Id.*) Plaintiff had good use of his hands, fingers and arms. (*Id.*) He was taking anti-inflammatory medications and narcotics. (Tr. 348.)

Plaintiff rated his pain six out of ten, and he was frustrated with his inability to work. (Tr. 380.) He was upset with his medical professionals for not resolving his pain. (*Id.*) On December 18, 2007, Plaintiff's physical therapist noted his frustration with his symptoms, but he had not been compliant with self-care recommendations. (Tr. 378.) Plaintiff reluctantly agreed to try aqua therapy, but three days later, he was very apprehensive about it. (Tr. 378-79.) After aqua therapy, Plaintiff had decrease in pain to a level of 4.5 out of ten. (Tr. 377-78.) Ten days later, Plaintiff's pain level was four out of ten. (Tr. 376.) He reported fair compliance with home exercise and self-care. (*Id.*)

Plaintiff followed up with Dr. Eich on January 4, 2008, and he was still miserable. (Tr. 391-92.) Dr. Eich recommended discontinuing use of the walker, using better posture, losing weight, and participating in a conditioning and strengthening program. (Tr. 392.) When Plaintiff returned to aqua therapy on January 7, 2008, his pain was worse because he had fallen on the ice that morning. (Tr. 375.) After therapy, he felt somewhat better. (Tr. 376.) On January 16, 2008, Plaintiff's pain level before therapy was three out of ten. (Tr. 372.) Plaintiff did not have his walker with him. (*Id.*) He was ready to progress to a land-based therapy. (Tr. 373.)

Plaintiff started land-based physical therapy on January 22, 2008. (Tr. 371.) He had a significant limp on the right side but with exercise and verbal cues, he was able to maintain a more upright stance. (Tr. 371.) On February 12, 2008, Plaintiff was walking in a fairly upright manner. (*Id.*) Although there were objective signs of improvement, Plaintiff was frustrated with his progress. (*Id.*) The next day, he was discharged from skilled physical therapy, having achieved his goals. (*Id.*) His pain was reduced to three out of ten, and he could walk without a walker. (Tr. 370.) He was not compliant with activity modification because he returned to farm work, feeding and caring for cattle. (*Id.*) Plaintiff admitted this increased his pain, but he was not willing to discontinue the activity. (*Id.*)

Plaintiff saw Dr. Eich on March 31, 2008, and he reported significant thoracic pain with occasional left leg symptoms. (Tr. 389.) He was taking ibuprofen and Parafon Forte,[6] and although he tried to reduce his medication, his symptoms recurred. (*Id.*) His use of Parfon Forte precluded him from working as a commercial bus driver. (*Id.*) Dr. Eich recommended a repeat trial of an epidural injection. (*Id.*) When Plaintiff returned on June 16, 2008, he reported no change. (Tr. 396.) He had some benefit from ibuprofen and physical therapy, and he was not a surgical candidate. (*Id.*)

On July 21, 2008, Plaintiff told Dr. Bettich he was having increased back pain recently, and he was taking ibuprofen and Soma. (Tr. 395.) Dr. Bettich added Percocet as needed. (Tr. 396.) When Plaintiff saw Dr. Bettich on August 21, 2008, he had stopped taking narcotics and muscle relaxants. (Tr. 393-94.) He hoped to get by on ibuprofen and return to some type of work. (Tr. 394.)

---

[6] Parafon Forte is used to treat muscle spasms and pain.
http://www.webmd.com/drugs/drug-58105-Parafon+Forte+Oral.aspx?drugid=58105&drugname=Parafon+Forte+Oral

Dr. Eich completed a Medical Opinion form regarding Plaintiff on August 3, 2008, opining that Plaintiff had a permanent 15 pound lifting restriction, and he needed to avoid repetitive twisting, bending and jarring.  (Tr. 353.)  Plaintiff would be unable to work in the foreseeable future.  (*Id.*)

On October 1, 2008, Plaintiff saw Dr. Bettich, reporting mid to low back pain, radiating into his legs.  (Tr. 393.)  Plaintiff tried to get by on ibuprofen, but his pain increased markedly, and he had to take Soma and Percocet.  (*Id.*)  On examination, he was tender, and his lower thoracic and lumbar muscles were tight.  (*Id.*)  Plaintiff saw Dr. Eich on October 30, 2008.  (Tr. 407.)  Dr. Eich noted Plaintiff had a severe reaction to an epidural injection, and Dr. Mullaney had concluded that Plaintiff was not a surgical candidate.  (*Id.*)  Dr. Eich opined that Plaintiff would have to continue with "trial and error protection of his back."  (*Id.*)

On November 17, 2008, Dr. Eich wrote a letter regarding his treatment of Plaintiff.  (Tr. 405-06.)  He believed Plaintiff's thoracic injury was permanent because Plaintiff did not have significant improvement after one year of treatment, and he was not a surgical candidate.  (Tr. 405.)  He opined that Plaintiff would need to limit his activities to avoid repetitive flexion, extension and rotation of the spine, and to avoid heavy vibration, jarring activities or overhead work activities.  (Tr. 406.)  Plaintiff would also need to continue taking ibuprofen.  (*Id.*)

On December 1, 2008, Dr. Bettich wrote a letter on Plaintiff's behalf.  (Tr. 424.)  He noted that Plaintiff had unrelenting pain after a car accident and continued to have significant pain requiring anti-inflammatories and narcotic pain medications.  (*Id.*)  Dr. Bettich noted that Plaintiff had significant loss of function in the ability to stand, bend, twist, reach and walk.  (*Id.*)  He opined that Plaintiff was permanently disabled.  (*Id.*)

C.    **State Agency Physician Opinions**

Dr. Gregory Salmi, a state agency physician, reviewed Plaintiff's social security disability file on initial review of Plaintiff's claim on September 28, 2007. (Tr. 267-69.) He determined that Plaintiff's back pain was nonsevere because objective findings pointed to a very mild back strain or soft tissue injury. (Tr. 268.) Dr. Howard Atkin reviewed Plaintiff social security disability file upon reconsideration of Plaintiff's claim on January 10, 2008. (Tr. 355 -56.) He completed a Physical Residual Functional Capacity Assessment regarding Plaintiff. (Tr. 357-64.) Dr. Atkin opined that Plaintiff could occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds. (Tr. 358.) Plaintiff could stand and/or walk and sit for 6 hours each in an 8-hour workday. (*Id.*) Plaintiff was limited in pushing, pulling and using foot controls. (*Id.*) He could occasionally stoop and climb ramps, stairs, ladders, ropes and scaffolds. (Tr. 359.) He could frequently balance, kneel, crouch and crawl. (*Id.*) Dr. Atkin noted Plaintiff's diagnosis was disc disease, and his treatment included anti-inflammatories, ultrasound, and use of a wheeled walker. (*Id.*)

### D.     Function Reports

Plaintiff's wife completed a third party disability questionnaire regarding Plaintiff for the SSA on November 29, 2007. (Tr. 201-03.) She indicated that Plaintiff had difficulty doing many things, and he could no longer help on the farm. (Tr. 201.) He particularly had difficulty putting on his socks and shoes because he could not bend. (Tr. 202.) He was slower than normal, and needed a break from activity after less than fifteen minutes. (*Id.*) He used a TENS unit for pain relief, and he used a walker. (Tr. 203.) Plaintiff's father completed the same questionnaire on December 1, 2007. (Tr. 204-06.) His responses were similar to those of Plaintiff's wife, and he stressed that Plaintiff could not help on the farm anymore. (*Id.*)

### E.     Administrative Hearings

Plaintiff, represented by counsel, testified at a hearing before an ALJ on December 12, 2008. (Tr. 19-45.) Plaintiff is married, and at the time of the hearing, his three children were five-years-old, four-years-old, and 22-months-old. (Tr. 24.) Plaintiff has a high school diploma and went to technical school. (Tr. 40.) He was in special education. (Tr. 41.) At the time of the hearing, his only income was his wife's disability benefits. (Tr. 24.) Plaintiff's job driving a school bus ended when he was in an accident in his personal vehicle on August 27, 2007. (Tr. 24, 27.) Plaintiff's van was rear-ended, and he was taken to a hospital because his left leg went numb. (Tr. 25.) Plaintiff followed up with his doctor, and his doctor prescribed ibuprofen, a muscle relaxer, and another medication that he could not remember. (Tr. 26.)

Plaintiff testified that he could no longer work because he could not bend, twist or work for an eight-hour day. (Tr. 29.) He could not drive a commercial vehicle while taking pain medication. (*Id.*) Plaintiff's pain, which fluctuated day to day, was in the middle of his back and went down his right hip. (Tr. 30.)

Plaintiff lived in a trailer on a cattle farm owned by his father. (Tr. 30.) He did not get income from the farm, but he had tried to help his father. (Tr. 30-31.) Approximately one year earlier, Plaintiff tried to feed the cattle, but he dumped the food and could not do it. (*Id.*) After the accident, on a normal day, Plaintiff would get up and go to water therapy at the YMCA. (Tr. 31-32.) After therapy, Plaintiff used the whirlpool, and then went home to nap for two hours or so. (Tr. 32.) His wife made their lunch and usually did the dishes. (*Id.*) Plaintiff cared for his children, but his oldest child went to kindergarten, and his middle child went to school for half-days. (Tr. 32-33.) Plaintiff could lift his 22-month-old daughter who weighed 28 pounds, but he would immediately sit her on his lap. (Tr. 33.) He went shopping with his wife, and he rode in a motor cart. (Tr. 33-34.) He helped carry some of the light groceries. (Tr. 34.) In the evenings, Plaintiff watched television,

walked, and he played cards with his father once a week for two or so hours, getting up every twenty minutes. (*Id.*) After sleeping four hours, Plaintiff had to get up and walk "to get the catches" out of his back. (Tr. 34-35.)

Plaintiff could shower, but he could not stand straight. (Tr. 35.) He could dress himself except for his socks and shoes, because it hurt to bend down. (*Id.*) Plaintiff felt more comfortable reclining. (Tr. 35-36.) He spent two or three hours per day in his adjustable bed. (Tr. 36.) He occasionally used a walker. (*Id.*) His treatment consisted of physical therapy, an epidural injection, which caused an allergic reaction, and a TENS unit. (Tr. 36-37.)

Plaintiff explained that his pain medication, ibuprofen and Percocet, made him sleepy and did not always take the pain away. (Tr. 38.) He had good days and bad days. (*Id.*) After an hour of sitting, he was in pain. (*Id.*) Without having anything to hold onto, Plaintiff could stand for only 15-20 minutes. (Tr. 39.) He could walk only two blocks. (*Id.*) He believed he could lift 10 pounds maximum without discomfort. (*Id.*) Bending and twisting were out of the question for him. (*Id.*) He did not do well on stairs, and cold weather made his back hurt. (Tr. 42-43.) If he was released to work after physical therapy, he would return. (Tr. 39.)

A vocational expert, Karl Botterbusch, testified at the hearing. (Tr. 41, 221-22.) The ALJ posed a hypothetical vocational question, asking the VE to assume an individual with limited education, and who was 42-years-old on the alleged onset date. (Tr. 42.) The individual could lift 20 pounds occasionally, 10 pounds frequently, stand and sit 6 hours each in an 8-hour workday, walk 2 blocks, and limited to no ladder climbing, occasional stair climbing, and occasional balance, stoop, kneel, crouch and crawl, and with frequent but not constant exposure to extremes of cold, and required a slight position change every 30 minutes. (Tr. 42-43.) The VE testified that Plaintiff's past work as a bus driver was at a medium exertional level; therefore, the individual described by the

ALJ could not perform the bus driving job. (Tr. 43.) The VE testified, however, that such an individual could perform other work, such as injection molding machine tender,[7] photocopy machine operator,[8] and office helper.[9] (*Id.*) These jobs allowed for a sit or stand option. (*Id.*)

For a second hypothetical question, the ALJ added to the first hypothetical question the requirement of an unscheduled two-hour rest break per day. (Tr. 44.) The VE testified such a person would not be eligible for competitive employment. (*Id.*) The VE also testified that if the individual in the first hypothetical question would miss more than two days of work per month due to back pain, he could not work. (*Id.*)

After a federal court remand, Plaintiff was present for a second hearing on August 24, 2011, and the ALJ took testimony from a medical expert and a vocational expert. (Tr. 452-70.) Plaintiff also briefly testified that Dr. Eich prescribed use of a walker after Plaintiff's car accident. (Tr. 467.) When Dr. Eich said Plaintiff could stop using the walker, he told Plaintiff to use a cane, which he had been using ever since. (Tr. 467-68.)

Dr. Steiner reviewed Plaintiff's medical records and found evidence of degenerative disc disease in the thoracic and lumbar spine, and some possibility of neural foraminal stenosis. (Tr. 459.) Other findings included hip bursitis, past history of hepatitis, and obesity. (Tr. 460.) Dr. Steiner testified that Plaintiff would have the physical residual functional capacity to "function at least at the light residual as far as lifting and time on feet." (*Id.*) In Dr. Steiner's opinion, Plaintiff's

---

[6] Dictionary of Occupational Titles ("DOT") Code 556.685-038, with 4,900 such jobs in Minnesota.

[7] DOT 207.685-014, with 2,300 such jobs in Minnesota.

[8] DOT 239.567-010, with 1,800 such jobs in Minnesota.

workplace restrictions would include occasional bending and twisting, stooping, kneeling, crouching and crawling, and no exposure to high concentrations of pollutants.  (*Id.*)

Dr. Steiner indicated that he meant to say sedentary not light exertional activity, and this applied for the period of August 27, 2007 through January 6, 2009.  (Tr. 461-62.)  Plaintiff's counsel asked Dr. Steiner if a person who required use of a walker could spend two hours a day on his feet. (Tr. 462.)  Dr. Steiner responded that there was evidence of symptom magnification, and the record did not provide a solid basis for the use of a walker for a prolonged period of time.  (*Id.*)  Dr. Steiner referred to exhibit 9F-11, stating that the answer to the question of whether the patient needed a cane or other assistive device was no, and it was dated December 11, 2007.  (Tr. 463.)  Counsel asked the VE whether Dr. Eich's RFC opinion was consistent with a sedentary RFC, and Dr. Steiner testified it was not.  (Tr. 464-65.)  Dr. Steiner's opinion was based on his review of the record, and his experience as a rehabilitation physician.  (Tr. 465.)

William Rutenbeck testified at the hearing as a vocational expert.  (Tr. 466, 667.)  He testified that Plaintiff could not return to his past medium and heavy work as a bellman.  (*Id.*)  The ALJ told the VE to assume a 46-year-old person with a high school education, who had Plaintiff's past work experience, who was in a car accident, who had impairments of degenerative disc disease, asthma and hip pain, and who was limited to lifting no more than 10 pounds, standing and/or walking 2 hours in an 8-hour day, sitting for 6 hours in an 8-hour day, occasional stooping, crouching, kneeling, crawling, and no exposure to noxious fumes or gases, avoiding ropes and ladders, and minimal stairway climbing.  (Tr. 466-68.)  The VE testified that such a person could

perform unskilled sedentary work including credit information clerk[10] and charge account clerk.[11]

(Tr. 468.)  The VE considered these to be low stress jobs.  (*Id.*)  However, if the person was

incapable of even low stress jobs, these jobs would be ruled out.  (Tr. 469.)  Also, if the individual's

doctor accurately stated that he could not maintain persistence or pace to engage in competitive

employment, the jobs would be ruled out.  (*Id.*)  The jobs would not be available to a person who

was limited to walking less than one block, sitting no more than one hour, and standing no more than

30 minutes.  (*Id.*)

### F.    ALJ's Decision

On September 27, 2011, the ALJ issued an unfavorable decision, concluding that

> 1.    The claimant meets the insured status requirements of the
>       Social Security Act through December 31, 2012.
>
> 2.    The claimant did not engage in substantial gainful activity from
>       August 27, 2007 through January 6, 2009 (20 CFR 404.1571 *et
>       seq*. and 416.971 *et seq.*).
>
> 3.    The claimant had the following severe impairments from
>       August 27, 2007 through January 6, 2009: degenerative disc
>       disease, asthma and obesity.  (20 CFR 404.1520(c) and
>       416.920(c)).
>       . . .
>
> 4.    The claimant did not have an impairment or combination of impairments that
>       met or medically equaled the severity of one of the listed impairments in 20
>       CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
>       404.1526, 416.920(d), 416.925, and 416.926).
>       . . .
>
> 5.    From August 27, 2007, through January 6, 2009, the
>       undersigned finds that the claimant had the residual functional
>       capacity to perform sedentary work as defined in 20 CFR

---

[9] DOT Code 237.367-014, with 600 such jobs in Minnesota.

[10] DOT Code 205.367-104, with 1,100 such jobs in Minnesota.

404.1567(a) and 416.967(a) with the following specific
limitations:  he could lift no more than 10 pounds, stand / walk
two hours in an eight-hour day and sit for six hours in an eight-
hour day; he could occasionally stoop, crouch, kneel and
crawl; no exposure to environments with noxious fumes or
gases; avoiding ropes and ladders; minimal stairway climbing.
. . .

6. The claimant was unable to perform any past relevant work
from August 27, 2007, through January 6, 2009  (20 CFR
404.1565 and 416.965).
. . .

7. The claimant was born on April 15, 1965, and was 42 years
old, which is defined as a younger individual age 18-44, from
August 27, 2007, through January 6, 2009 (20 CFR 404.1563
and 416.963).

8. The claimant had at least a high school education and is able to communicate
in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability
because using the Medical-Vocational Rules as a framework supports a
finding that the claimant was "not disabled," whether or not the claimant had
transferable skills from August 27, 2007 through January 6, 2009 (See SSR
82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and the residual
functional capacity, there were jobs that exist in significant numbers in the
national economy that the claimant could have performed (20 CFR 404.1569,
404.1569(a), 416.969, 416.969(a)).

. . .

11. The claimant was not under a disability, as defined in the Social Security Act,
from August 27, 2007, through January 6, 2009. (20 CFR 404.1520(g) and
416.920(g)).

(Tr. 434-44.)

In arriving at Plaintiff's residual functional capacity, the ALJ reviewed Plaintiff's

allegations: (1)  he can barely walk due to pain caused by a car accident; (2) he is unable to drive

because sitting is painful, and he takes medications that make it unsafe to drive; (3) he cannot lift;

(4) his pain is constant but fluctuates in severity; (5) he has difficulty bending and twisting; (6) pain makes it difficult for him to sleep, and he spends two hours per day in bed. (Tr. 437.) The ALJ also considered the questionnaire completed by Plaintiff's wife, indicating Plaintiff had much difficulty with activities due to pain. (*Id.*) The ALJ considered the questionnaire completed by Plaintiff's father, which corroborated Plaintiff's wife's report and stated that Plaintiff could not work on the farm due to pain. (*Id.*)

The ALJ gave little weight to the statements from Plaintiff's wife and father because they are not medical providers, and they did not provide specific work-related limitations. (*Id.*) The ALJ credited their statements regarding Plaintiff's limited ability to lift, stand and walk, to the extent the limitations were supported by objective medical findings. (*Id.*) The ALJ also noted Plaintiff's family members stood to gain from Plaintiff's receipt of benefits, and they were incapable of offering an objective assessment of Plaintiff's limitations. (*Id.*)

The ALJ found Plaintiff partially credible and limited him to sedentary work with postural limitations due to back pain and obesity, and no exposure to pulmonary irritants due to his asthma. (Tr. 438.) The ALJ did not fully credit Plaintiff's subjective complaints due to inconsistencies in the record. (*Id.*) First, Dr. Steiner testified that Plaintiff could perform sedentary work with certain postural limitations. (*Id.*) Dr. Steiner did not see anything in the record that would support Plaintiff's need to use a walker for eight to nine months. (*Id.*) Dr. Steiner also testified there was evidence of symptom magnification in the record. (*Id.*) The ALJ's RFC finding was largely based on Dr. Steiner's testimony, which he credited for the following reasons. (*Id.*) Dr. Steiner is an expert in Physical Medicine and Rehabilitation. (*Id.*) He had the opportunity to review all of Plaintiff's medical records before the hearing, and he had specialized knowledge of the disability regulations. (*Id.*) Finally, Dr. Steiner's RFC opinion was consistent with the "weight of the

objective medical findings of record." (*Id.*) The ALJ acknowledged that Plaintiff had periods of greater and lesser pain but concluded there was no twelve-month period during which Plaintiff could not perform work within the RFC. (*Id.*)

The ALJ reviewed Plaintiff's medical records, noting his initial diagnosis after the car accident was lumbar strain. (*Id.*) When Dr. Bettich first examined Plaintiff after the accident, his only objective finding was slightly limited range of motion. (*Id.*) In October 2007, Plaintiff used only over-the-counter pain medication, and it helped somewhat. (Tr. 439.) Subsequent exams showed similarly limited objective findings, although Plaintiff appeared to have difficulty walking and standing up straight. (*Id.*) The ALJ stated that he considered Plaintiff's obesity, and the RFC finding accounted for limitations from Plaintiff's obesity, although none of Plaintiff's treating providers opined that Plaintiff's obesity caused any functional impairments. (*Id.*)

The ALJ specifically addressed Plaintiff's credibility, noting that the objective medical findings did not support the level of restriction alleged by Plaintiff. (*Id.*) Plaintiff's treatment was routine and conservative in nature. (Tr. 440.) Plaintiff had physical therapy from September to November 2007, with little success. (*Id.*) His second round of physical therapy, December 2007 through February 2008, was more successful, with Plaintiff's pain level decreasing from a severity of nine to three, on a scale of one to ten. (*Id.*) When Plaintiff was discharged from physical therapy, his therapist noted Plaintiff had difficulty recognizing his improvement, but he no longer required a walker, and he rated his pain level significantly lower. (*Id.*) Plaintiff's therapist also noted Plaintiff was not compliant with activity modification recommendations because he continued to work on his farm. (*Id.*) The ALJ found that this seriously reduced Plaintiff's credibility. (*Id.*)

The ALJ also found that Plaintiff's daily activities were inconsistent with his subjective pain and limitations. (*Id.*) In September 2007, Plaintiff was walking more and going with his wife to her

medical appointments.  (*Id.*)  He had to care for their three children, including lifting his 7-month-old child, because his wife was ill.  (*Id.*)  Before a 7:30 a.m. physical therapy appointment, he did two loads of laundry.  (*Id.*)  Significantly, Plaintiff did some rigorous farm work, including driving his father's grain truck, hauling corn for more than eleven hours one day, and feeding and caring for cattle.  (*Id.*)  Although Plaintiff admitted these activities increased his pain, he was unwilling to stop while he was in physical therapy.  (*Id.*)  The ALJ credited Plaintiff for having a good work history, but this wasn't enough to credit his subjective complaints in light of the absence of objective findings.  (*Id.*)

The ALJ considered the opinion of Dr. Kim, who opined in late 2007 that Plaintiff could resume full activities without restriction.  (Tr. 440.)  The ALJ gave Dr. Kim's opinion some weight but agreed with Dr. Steiner's opinion that Plaintiff would have some work restrictions.  (Tr. 441.)  The ALJ also reviewed Dr. Eich's multiple disability opinions.  (*Id.*)  He rejected Dr. Eich's December 2007 opinion because it was inconsistent with Dr. Eich's treatment records and other treatment records from other providers.  (*Id.*)  It appeared that Dr. Eich relied heavily on Plaintiff's subjective reports, but there was good reason to discount those subjective reports.  (*Id.*)  Many of Dr. Eich's work restrictions were conjecture, such as Plaintiff's inability to concentrate and pay attention for 75% of the day.  (*Id.*)  Plaintiff never complained of concentration and attention difficulties to Dr. Eich nor did Dr. Eich note observing any such symptoms.  (*Id.*)  Dr. Eich also opined that Plaintiff was incapable of even low stress work, but there is nothing in the record indicating why he could not cope with even low stress.  (*Id.*)  The ALJ discounted Dr. Eich's January 2008 medical opinion because his only statement was that Plaintiff was unable to work into the foreseeable future, and this was an issue reserved for the Commissioner to determine.  (*Id.*)

On the other hand, the ALJ credited Dr. Eich's November 2008 opinion, indicating Plaintiff would likely need to continue to use anti-inflammatories, limit repetitive flexion, extension and rotation of the spine, and avoid exposure to heavy vibration, jarring activities or overhead work. (Tr. 441-42.) The ALJ stated, "[g]enerally, these limitations are accommodated in the [RFC] defined above . . . " The ALJ also rejected Dr. Bettich's December 2008 opinion that Plaintiff was permanently disabled because ability to work was an issue reserved to the Commissioner. (Tr. 442.) Finally, the ALJ considered the state agency consultants' opinions but gave Plaintiff greater work restrictions based on Dr. Steiner's testimony. (*Id.*)

## III. CONCLUSIONS OF LAW

### A. Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. 405(g); *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Moore ex rel Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. *Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir. 2005).

24

**B.      Discussion**

Plaintiff raises two arguments in support of summary judgment.  First, he contends the ALJ failed to develop evidence of Plaintiff's ability to work on a regular and continuing basis, contrary to the district court remand.  Second, Plaintiff asserts the ALJ erred by granting more weight to nontreating, nonexamining physicians' opinions than to Plaintiff's treating physicians' opinions.  The Commissioner asserts the ALJ gave good reasons for discounting Plaintiff's credibility, and the ALJ's decision is supported by substantial evidence in the record.

The objective medical evidence supporting Plaintiff's allegation of disabling back pain is minimal.  He suffered a lumbar sprain from a car accident, and he has degenerative disc disease of the lumbar and thoracic spine, as well as obesity and asthma.  He had noticeable muscle spasm in his back in one examination, but in other examinations, there was no spasm.  Due to the minimal objective findings, it appears that treating physicians Drs. Eich and Bettich relied significantly on Plaintiff's subjective complaints of pain in support of their disability opinions.  A treating physician's opinion is ordinarily entitled to substantial weight, but when the opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can afford it less weight.  *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003).

Furthermore, Dr. Eich gave inconsistent opinions of Plaintiff's functional restrictions.  In November 2008, Dr. Eich opined that Plaintiff would need to limit repetitive flexion, extension and rotation of the spine, and avoid exposure to heavy vibration, jarring activities or overhead work.  The ALJ found this to be generally consistent with the record overall, and that the restrictions were accommodated by the RFC finding.  But in December 2007, Dr. Eich had opined that Plaintiff was significantly more restricted, and his functional restrictions were at less than a sedentary level.  An ALJ may also discount a treating physician's opinion when the physician gives inconsistent opinions.  *Prosch*

*v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). Furthermore, an ALJ may grant more weight to a state agency physician's opinion when it is better supported by all of the evidence in the record. *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004). The ALJ credited Dr. Steiner's opinion because it was consistent with the objective medical findings.

The absence of objective medical evidence to support subjective pain complaints is one factor in determining a claimant's credibility, but it cannot be the sole factor. *Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010) (citing *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008)). Plaintiff's credibility is the primary issue in determining his RFC in this case. *See Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005) (subjective complaints play a role in assessing RFC). The ALJ must "acknowledge and consider" but need not discuss each credibility factor described in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). *Halvorson,* 600 F.3d at 932. The credibility factors are prior work history and observations of third parties and treating and examining physicians relating to such matters as daily activities; duration, frequency and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Polaski*, 739 F.3d at 1322. "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* "If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [courts] will normally defer to the ALJ's credibility decision." *Halverson*, 600 F.3d at 932 (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008).

The ALJ found Plaintiff's work history was a positive credibility factor but not significant enough to fully credit Plaintiff's subjective complaints in light of minimal objective findings. Plaintiff alleged he could barely walk and needed to use a walker or cane to get around. The ALJ discounted this allegation because Dr. Steiner testified the record did not provide a solid basis of Plaintiff's need for a walker, and there was evidence of symptom magnification. The record supports Dr. Steiner's testimony.

Dr. Eich completed a questionnaire regarding Plaintiff on December 11, 2007, indicating that Plaintiff did not require a cane or other assistive device to engage in occasional standing or walking, but that he needed an assistive device to perform daily activities. There is, however, other evidence that Plaintiff did not require an assistive device.

Plaintiff testified that Dr. Eich prescribed the walker to him, but Plaintiff was already using the walker when he first saw Dr. Eich for consultation regarding his back pain in October 2007, suggesting Plaintiff was never prescribed a walker for his lumbar sprain. Nevertheless, Dr. Eich told Plaintiff to continue using the walker. In January 2008, Dr. Eich told Plaintiff to discontinue use of the walker, and he recommended working on better posture, losing weight, and participating in a conditioning and strengthening program. When Plaintiff finished his second course of physical therapy in February 2008, he could stand upright and walk without an assistive device. There is no evidence that he was prescribed a cane after that. Furthermore, Dr. Kim observed that Plaintiff stood in a hunched over position, but he sat up straight in a chair, indicating no need to bend in a forward flexed position. Dr. Kim questioned Plaintiff's need for a walker. Substantial evidence in the record supports the ALJ's decision that Plaintiff could perform sedentary work without the use of an assistive device for standing and walking.

Plaintiff also testified that he was no longer able to help on his father's farm after his car accident. Prior to the accident, he worked as a bus driver and farmed on the side. Plaintiff applied for disability about a week after his accident. The ALJ discounted Plaintiff's credibility based on his post-accident farm work. In late October 2007, Plaintiff spent eleven hours one day driving a tractor hauling corn. About a week later, Plaintiff fell off of his father's grain truck when he was climbing out the back. In February 2008, Plaintiff's physical therapist noted that while Plaintiff had improved, activity exacerbated his pain, and he was not compliant with activity modifications because he continued to feed

and care for cattle on the farm.  These activities are inconsistent with Plaintiff's subjective complaints and with the function reports from Plaintiff's wife and father, stating that he could no longer do farm work.

The ALJ also considered the fact that Plaintiff cared for this three children, one of whom was less than one-year-old at the time of the accident.  Plaintiff alleged that bending was out of the question due to his back pain.  Only a month after his car accident, Plaintiff's wife was ill, and he had to take her to medical appointments and care for their children.  He admitted that he lifted his baby, although he said he had to sit down with her immediately.  Caring for a baby is inconsistent with inability to bend and with inability to stand without assistance.  The ALJ also noted that, on one occasion, Plaintiff had done two loads of laundry before his 7:30 a.m. physical therapy appointment.  This evidence is inconsistent with the treating physicians' opinions and Plaintiff's subjective complaints.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ALJ properly discounted credibility where Plaintiff's allegation of disabling pain was inconsistent with ability to care for one of his children on a daily basis, drive a car, and grocery shop); *Sitzman v. Astrue*, No. 7:11CV5006, 2012 WL 1437281, at *10 (D. Neb. April 15, 2012) (ALJ properly considered evidence that claimant performed part-time farm hand duties in discounting claimant's subjective complaints).

The ALJ considered Plaintiff's course of treatment, and noted that it was routine and conservative.  During his first course of physical therapy, Plaintiff's physical therapist noted he was overdoing his activities when he had relief from pain medication, then he exacerbated his condition.  After Plaintiff's second course of physical therapy, he rated his pain three out of ten, and he could walked unassisted.  His improvement occurred although he had refused to give up feeding and caring for the cattle on his farm.  *See Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (finding support for

ALJ's credibility determination where claimant did not attend physical therapy regularly but nonetheless improved with the physical therapy administered).

Plaintiff also received some benefit from over-the-counter and prescription pain medication, and Dr. Eich opined Plaintiff would likely need to continue use of ibuprofen, implying that he did not need to continue other prescription pain medications. *See id.* at 430 (primary use of over-the-counter medications supported the ALJ's determination). Apart from Plaintiff's testimony that his medication made him sleepy, Plaintiff never reported any medication side effects to his providers, with the exception of Vicodin making him sick on the night of his car accident. *See Van Vickle v. Astrue*, 539 F.3d 825, 829-30 (8th Cir. 2008) (finding claimant's subjective complaints inconsistent with the record where medical records did not support allegations of significant side effects). These facts, particularly Plaintiff's failure to follow activity modification recommendations, resulting in a slower recovery but improvement with treatment nonetheless, support the ALJ's decision to discount Plaintiff's allegations of disabling pain.

Plaintiff asserts the ALJ failed to address his limitations in maintaining persistence or pace to work eight hours a day, five days per week. The objective medical findings, early degenerative disc disease and tight muscles, do not suggest such limitations. Thus, Dr. Kim opined Plaintiff had no restrictions whatsoever. Only Plaintiff's subjective complaints support his allegation of inability to maintain persistence or pace for competitive employment, and the ALJ credited his complaints to some extent by restricting Plaintiff to sedentary work. Because the ALJ gave good reasons to discount Plaintiff's credibility, there is no support in the record for Plaintiff's allegation. For these reasons, the ALJ's decision should be affirmed.

## IV. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment (# 12) **be denied;**

2.    Defendant's Motion for Summary Judgment (#19) **be granted;**

3.    The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**

DATED:  December 6, 2013

                                                   _s/Franklin L. Noel_____
                                                   FRANKLIN L. NOEL
                                                   Unites States Magistrate Judge


        Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before December 23, 2013, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.